You don't even need to sit down, unless you want to rest. OK, can I start off with a similar kind of question that I just asked you about 597, but this is about 550. So do I understand right that the district court litigation that you brought against Google on 550 sometime in 2023, you resolved so that that suit's no longer pending? I believe the cert actually stayed in California right now, in A&E California. There was a, I guess I'm reading from a joint status report from May 8th, 2025, saying on July 26th, 2023, EcoFactor covenanted not to sue Google on the 550 patent. Do I have that wrong? That is correct, Your Honor, but that was not an admission of invalidity or non-infringement. No, no, I'm not suggesting that it was. But then the question is, I think I kind of know the answer, I just want to confirm. This patent, if it were revived, would have a lot of life left in it, and you care about it, even though you stopped paying maintenance fees? Yes, Your Honor.  And may it please the court, particularly because of other recent developments between EcoFactor and Google before this honorable court, we have some interest in reviving other patents, maintaining our patents. I think I get the reference. All right, may it please the court. Again, this appeal is very similar to the one we just talked about, and the main issue of this one is the exact same one that my colleague and I just discussed, about LRs and figure 3D and predictions and recording and learning and tracking. I'm going to... Yeah, I wouldn't, don't just repeat yourself. Yes, I'm going to skip almost all my notes about that part that we already went over. I will say that when, what my colleague said is a little bit different than what EcoFactor concedes, is that figure 3D shows a graph showing the indoor set point, parentheses temperature, in parentheses, versus time. So if you look at figure 3D, in the x-axis is time, on the y-axis it says indoor set point. It doesn't say the temperature of the house. And so to judge Stoll's question, it's not clear what figure 3D shows. It's not clear if it shows if you're measuring an increase in the actual temperature of the house, or a temperature of the, or someone's slowly moving the set point up in a linear fashion as you see in figure 3D. And I think part of that is because... Now the board said that it was the temperature of the house, right? The board did say that, yes. Yes, and would you agree that there's at least substantial evidence in the written description describing figure 3D to support that? We would argue that there is a scintilla of evidence supporting that, but nothing more than that. That's substantial evidence, right? Well, a scintilla is not substantial evidence. It depends on the case you're looking at, but okay. So you would say a reasonable fact finder couldn't find that? Certainly, and to briefly address my colleague's point about the experts at issue in this, let me be clear that Ecofactor is not asking you to listen to our experts' declaration or read our experts' declaration. We're not even challenging Google's experts' declaration. We're submitting that the court, under the substantial evidence standard, must look at all the evidence that both justifies and detracts from the agency's opinion. And justifying it in that column we submit is almost entirely just petitioner's expert opinion. And detracting from that, Ecofactor submits, is the reference itself, Eller's figure 3D, paragraph 253, 254, 256, as my colleague discussed. And we believe that when viewed as an entire record, the substantial evidence does not support the board's decision there. I will move on to a unique issue in this 1367 appeal, and this is from Ecofactor's blue brief at 40. The board's final written decision in both the 969 and 983 IPRs, which both dealt with a 550 patent, just different sets of claims, but combined the entire set of claims. In there, the board determined that the combination of Eller's, which we see again, and a new reference, Ruck, that's at appendix 5148, teach the limitation, quote, to compare the one or more automated set points with said actual set point programming, end quote. Now Ecofactor's position, not surprisingly, is that that is not shown by substantial evidence. It is only shown by petitioner's expert's opinion as to a single table in Ruck, rather than any of the specification or the written words in the specification. So as the petition and the board note, the fifth column of table 28, so we're looking at another picture in a patent here, the fifth column labeled comments, there's a comment that states, quote, display actual temporary set point data if delta value is less than or greater than zero. Now that quotation from table 28 of Ruck is the only place that the phrase delta value is used in Ruck, and we think it's important to note that delta value is capitalized, at least the word delta is capitalized in that. Nothing else in table 28, and nothing else in the Ruck reference, ever describes or defines what this delta value means, what it's comparing, what it's doing. And in fact, neither the petition nor the board cite to anything else in Ruck other than that line in table 28. And so here, Ecofactor's position is that the board, or more specifically petitioner's expert, looked at table 28 almost like a Rorschach test, and what he saw is what he says it means, and we do not believe that is substantial evidence. Now the petitioner's expert points to the single portion, the single line in table 28, and then offers his opinion that because table 28 has these words, that again are not defined within Ruck, because table 28 has these words, therefore it must teach, and then he quotes the claim limitation itself. But I will note at the deposition of petitioner's expert, he was unable to provide any support from the specification of Ruck for his assertion beyond the single note that we just discussed in table 28, and that deposition is at appendix 7532, pages 23, lines 1 through 19. Now Ecofactor argued before the board, as we're now arguing before this court, that Ruck does not disclose any automated set points, and an automated set point is of course different than a manual set point, and it's important that Ruck does not disclose automated set points, because the claim language at issue here in the 550 patent is to compare the one or more automated set points with said actual set point program. So we submit that it is very crucial here that Ruck does not disclose automated set points. At the bottom of the board's opinion on this claim limitation, the board simply adopted petitioner's expert's opinion, and yes, we submit conclusory opinion, about what he believed table 28 to mean. If it's not conclusory, the board can adopt, as long as it clearly considers all the evidence, it can adopt their expert in that substantial evidence, right? Certainly, and if they did adopt it, and this court agrees that that was substantial evidence, I lose. And so my job here today is to prove that that is not substantial evidence, and if I'm unable to do that, I fail. And on that point, there is no evidence, let alone substantial evidence, that the, quote, delta value listed in table 28 in that one little column is the claimed difference between two set points, let alone between an automated set point and a manual set point, as required by the claim limitation. My last issue in this 1367 appeal is that the board's final written decisions in these two IPRs determined that a person having an ordinary skill in the art would have been motivated to combine the teachings of Ehlers and Ruck, but we submit that is not supported by, again, substantial evidence. And this point is actually very closely related to the table 28 I just had, because table 28 does not disclose what delta value means, what delta is comparing. I don't think we, we're not disagreeing that in mathematical terms, in technical terms, delta generally means a comparison of two things. What we're arguing is that it's not clear what two things are being compared in Ruck. So Ruck compares a comparison of something, but we submit it does not compare an automated set point to an actual set point. What about, I mean, you're looking at a combination, right? I mean, it's a combination reference as Ehlers and view of Ruck, right?  So what about the combination and whether the combination does that comparison? Is Ruck just being relied on to modify Ehlers to make sure it's very clear that Ehlers is making a comparison of an automated set point? Well, we think because Ruck is not concerned with automated set points, Ehlers does discuss automated set points based on the learned and tracked behavior of historical thermal characteristics. So Ehlers does discuss automated set points, but I guess what my argument is here is that if someone wanted to figure out a way to, a further way to modify Ehlers, they would not look to Ruck, because Ruck does not use those types of automated set points to begin with. So there is no bridge between, or reasonable bridge between Ruck and Ehlers that would motivate a person of skill in the art to do so, and we don't believe that the board or the petitioner showed that. So another way of saying that, that I have is that a person looking at Ruck would only see manual set points, that people have set point here, someone changes set point here, and then a single unexplained use in table 28 of the term delta value, neither of those disclosures of Ruck, nor the combination of them frankly, provide any evidence, let alone substantial evidence, that a person of skill in the art would have a reason or motivation to combine the teachings of Ruck with the teachings of Ehlers to specifically teach the comparison of one or more automated set points with the said actual set point programming as required by the claims at issue here. And unless the court has further questions, I yield the remainder of my time. Okay, thank you. Thank you. Ms. Lawton. Good morning again, your honors. May it please the court. Again, Elizabeth Lawton on behalf of Google. This case is very closely related to the case that we just heard, and unless the court has any specific questions. Why don't you move to the new issues, the table 28? Sure, if you'd like me to address that. So with respect to the new issue. Table 28 and the motivation to combine.  And so the first thing I'd like to note is that those issues were also in the prior appeal. We just didn't discuss them. We just didn't. I would submit, your honor, it's not just that we didn't discuss them, it's that they weren't argued. They were not raised. So the board had findings on those issues in terms of in the 597 IPR, the board made findings regarding the combination of Ehlers and Ruck, and specifically that it... Specifically for the very similar claim limitation. Specifically for the very similar claim language, and no arguments were actually presented on this issue in that case. So this is something that they argued here only for the 550 patent, but they never argued it for the 597 patent. I'm not quite sure what the bottom line point is you want us to draw from that. My point, your honor, is issue preclusion. So once this court affirms, if this court were to affirm it, once this court affirms in this morning's appeal, that decision would actually have issue preclusive effect in this appeal. Because there is a final determination by the board on those exact issues as to the same claim elements. And, in fact, in the XY LLC versus trans-OVGN. Can you talk a little bit about the merits of it anyway? Absolutely. Because I think in your brief you made an argument about issue preclusion that I don't remember your saying what I'm... I don't remember your saying I'm making an anticipatory issue preclusion argument that is anticipatory if we win on the first claim. And it certainly would not be issue preclusion just because it's an unappealed issue because they could win the other case and then it wouldn't be necessary to the judgment. The issue preclusion argument here assumes that this court would affirm. Okay. Let's get to the merits then of those two points. Of course. So specifically with respect to the merits, I want to note that there are actually two theories at issue here. There's a theory as to this claim element that's only based on AILERS. And then there's also a theory that's based off of the combination of AILERS and RUC. And so what I heard today was a lot of focus on the combination of AILERS and RUC. But I do just want to note that there was a separate independent basis for the board's decision. And the board did rely on AILERS. Do you think the board relied on AILERS alone? I do believe that the board relied on AILERS alone. I think it said that very clearly in its decision. I think it was very clear in the petition that multiple theories were being presented. I think it was clear in the institution decision that multiple theories were being presented. In our briefing, we called out all of the places and quoted all the places where it was very clear that the petition was arguing that AILERS alone was sufficient, but that RUC was really just being added for an abundance of caution here. And so I think the board, consistent with those arguments, made independent alternative findings. So is it the finding on page A37 where it says, Petitioner demonstrates that a person of ordinary skill in the art would have known to compare the actual set point with the automated set points in discussing AILERS alone? Is that, I just want to make sure I have the right place. It bridges, it's a paragraph bridging pages A36 and 37. 36. I apologize. And you said A36 and A37. That's right. The paragraph that bridges it. The paragraph that bridges those two pages? Yes. I mean, there's paragraphs above too. I think that that paragraph is where I thought that the board was making its finding with respect to AILERS alone. I think that's correct. I would also just note also on appendix page 39 specifically says that AILERS teaches or suggests different notation. So I think that it's certainly addressing the finding there as to AILERS alone. It's specifically talking about it being obvious from AILERS teachings. And then, again, as Your Honor points out, at the end of that paragraph going into appendix 37, then it says as to the combined teachings of AILERS and Ruck. Then it's now talking about the alternative theory about the combined teachings. And so I think that because no argument has been presented challenging the theory based on AILERS alone, this court can certainly affirm based on that theory here. And, again, I think that perhaps the reason an APA argument or something like that was not made is that there was just very clear notice that that was the theory throughout both in the petition and institution decisions. And that was just how Ecofactor chose to argue it. So then moving on specifically to the combined teachings of AILERS and Ruck, this court may certainly affirm based off of that basis as well. So I'd like to just emphasize the very limited nature in which the petitions actually relied on Ruck here. Basically saying, look, if you have two things, if you have two set points, and you want to know whether or not they are different, the most obvious thing to do would be to compare them. Is 72 different from 76? Make a comparison. What's the magnitude of the difference for? That's obvious. And I think what the petitions were doing is saying, and here's an example of this exact kind of thing in Ruck. And I would submit that there certainly is substantial evidence regarding Ruck of how a person of ordinary skill in the art would understand Ruck. So specifically, Ruck talks about that this is a delta value. And as counsel said, I think we all understand that that means a change, a comparison. That's what the evidence here showed as well. And it talks about it being an actual temporary set point. So we know it's talking about a set point, and it's deciding whether or not to display that set point. And so a person of ordinary skill in the art, looking at this, the evidence demonstrates a person of ordinary skill in the art looking at this would say, what this is showing me is that we're looking at whether or not there's a change, a difference, a comparison between this actual temporary set point and some other comparable value. What would that comparable value be? What would a person of ordinary skill in the art think that is? Another set point. And so that's how we know we're going to display the temporary set point as opposed to, for example, this other set point that is in play. And so the evidence demonstrates here, and there's certainly substantial evidence that a person of ordinary skill in the art would understand that this is exactly the kind of thing that you could do, and that this would be a way that this could be done in ALERS. Because there was not a lot in the briefing about ALERS, but there was below, and the board's findings on this go into this. ALERS system is all about learning the user's manual changes to set points. That's what it wants to do. It doesn't want to have a system where if you want the temperature to change throughout the day, you have to go up and constantly fiddle with it. It wants to, over time, learn what temperature you like it to be at all these various times, and then just do that automatically. That's the goal. It says it wants to free the user from having to come and make all of these manual changes. And as we saw, ALERS computes automated set points by the system. It isn't just the user setting them. The system is setting it. In order to figure out what set point is in play here, or what set point to use, the most obvious thing to do would be to compare the manual set point by the user. I'd like it now to be 70 degrees because I'm very warm, and I'm working out in my apartment or something, in my house, and I'd like it to be extra cool. And what the system has set it at. For example, the system wants it to be 75 because it's trying to save energy or something like that. So RUC is relied on in a very limited manner here, and it certainly supports the obviousness of doing a comparison of set points. And again, I just want to back up that that really is the issue here. It's just, do we compare two comparable numbers to find out whether or not they are the same or different? That's the obviousness question. And the testimony and the evidence is certainly more than sufficient to support the obviousness of that. And then turning back to the predicted rates of change, I just wanted to respond very briefly to something that Council stated regarding it being only Google's experts testimony or something like that. I believe, I don't want to mischaracterize it, but I believe he said something along those lines. Supporting the determination, the board specifically relied on EcoFactors experts testimony throughout in its decision. And in fact, both experts testimony supported this understanding of Ehlers thermal gain rates. And Dr. Palmer's testimony was either unsupported and inconsistent or in fact supported the idea that these are rates of change of temperature. And the board specifically called that out here. And so I just want to note that it's not just like Google's expert had a particular interpretation of this, but that in fact all of the evidence was consistent regarding the thermal gain rates. And that's what the board was in fact trying to do, was trying to understand Ehlers as a person of ordinary skill in the art would do. And look at it as a whole, try to make sense of the disclosure, look at it from the perspective of somebody who understands these things, and to come to an interpretation that is consistent with all of the teachings of Ehlers. And only Google's and only Google's experts testimony here offers that. The EcoFactors certainly does not. You may be responding to the comment that caught my ear too, but at the beginning of this argument, Mr. Aikili said something about what 3D of Ehlers shows or doesn't show. Is that consistent with what you said he conceded in the first argument, or has he gone back to now challenging what 3D shows? What's your understanding? To be frank, Your Honor, I don't really understand at this point anymore. I've heard many, many different things regarding what— Because you did have confidence in the first argument that he was no longer fighting something. Do you have that confidence now? I thought I heard that pretty clearly in the first argument. It seems like he now wants to walk that back. I would just say his briefing concedes it as well, concedes it in reply. In this one? Yeah, in this one and also in the other one as well. If I could find the particular page number here. I believe I'm looking at the reply in particular. Let's see what I'm looking for. On page 9 of the reply brief, he says, Google invites the court to repeat the board's error, which was only to look for evidence of tracking historical rate of change. He talks about Figure 3D, and he says, The temperature is changing in Figure 3D. That is what their own expert stated in his declaration and at deposition. For what it's worth, I guess I thought maybe what he was saying about the— in this argument about the Figure 3D that the label on the y-axis uses set point, which is, I don't know, perhaps an odd label for that axis. If you just mean if the temperature in the house starts at 72 or 74 or 78, this is what's going to happen if it's 99, 90, or 77 degrees outside, which is what these curves are showing. The label set point on the y-axis is odd for that. You would use the label set point if you maybe are talking about an active system, not an off system. I think that's what I took his point to be. Your Honor, that makes sense to me. I think that's certainly what they seized on. And I think that as the testimony makes clear here, and I think his own expert's testimony makes clear, what it's talking about is that it's controlling it to an initial starting set point. So we're talking about where are we starting? We're at the set point of 72, 76. That's where we are. And now we're going to see how it behaves. And really— But it now is the house and not the HVAC system. The temperature. Yes. The temperature. The temperature, just the house doing what the house does with the system off. Right. And I would just note that the patents at issue here do the same thing. And we've pointed that out in the briefing. Yeah, I do think that's what they're seizing on. But I think certainly if you had the system on, the figure just wouldn't make sense because it's talking about how the thermal gain differential is decreasing until the inside temperature reaches the outside temperature. If the system is on and driving it down to the set point, you're not going to see that. And, again, Ehlers makes clear. It says that it is a rate of change of temperature and time. Ehlers says that in paragraph 255. And also Dr. Palmer testified that it's tracking temperature and time there. So if it's tracking temperature and time, you wouldn't see it reaching the outside temperature, right, if you have the HVAC system going on and driving it back down to the set point. And so I think what it's trying to do there is just collect all of this different data for all these different data points so that, again, it can use that data to model future conditions. And I see I'm over my time. Unless your honors have anything further, I thank you very much. Thank you. Thank you. Thank you. Thank you, your honors. I think I actually wasn't even going to give a rebuttal, but I wanted to address one thing that my counselor just said, is that I think she just said, if the system is on, figure 3D doesn't make sense. And on that we agree. And I think that runs headfirst into our argument specifically about the 186 patent, which has a claim limitation requiring that the location be, quote, conditioned by an HVAC system. And if the system is not on, we submit that is not, quote. Is the 186 patent at issue in this case you're arguing right now? It is not, your honors. Okay, thank you. Do you acknowledge that issue preclusion is in front of us and right in this case, if we were to affirm in the first case you argued today? I certainly believe that is very likely, unless you decide this case first in that case. However, this course, we'll just proceed. Thank you, your honors. Okay, thank you. Thanks to all counsel. The case is submitted.